UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
ROMAN TERESHCHENKO,                      :
                                         :
                         Petitioner,     :     23cv2006 (DLC)
                                         :
              -v-                        :       OPINION
                                         :     AND ORDER
YASAMIN KARIMI,                          :
                                         :
                         Respondent.     :
                                         :
---------------------------------------- X

APPEARANCES:

For the petitioner, Roman Tereshchenko:
Richard Min
Michael Banuchis
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, NY 10170

Daniel Lipschutz
Aronson Mayefsky & Sloan, LLP
12 E. 49th Street, 32nd Floor
New York, NY 10017

For the respondent, Yasamin Karimi:
Bruce A. Barket
Aida Ferrer Leisenring
Barket, Marion, Epstein & Kearon, LLP
666 Old Country Road
Garden City, NY 11530

Stephanie Renee Schuman
Leaf Legal, P.C.
24 E. 21st St., 4th Floor
New York, NY 10010

DENISE COTE, District Judge:

On January 3, 2024, a hearing was held on the petition filed by Roman Tereshchenko pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (the "Hague Convention").  For the following reasons, the petition is granted.

## Background

Tereshchenko is the father of M.T. and K.T., who were habitual residents of Ukraine before Russia's invasion of Ukraine on February 24, 2022.  They were born, respectively, on March 27, 2016, and June 3, 2017.  They are now ages seven and six.  Their parents, both of whom are citizens of Ukraine, are respondent Yasamin Karimi ("Karimi" or the "Mother") and petitioner Tereshchenko ("Tereshchenko" or the "Father").  M.T. was born in Kyiv, Ukraine; K.T. was born in Broward County, Florida.  The parents married in Odesa, Ukraine, on April 22, 2017, after the birth of their first child, and divorced the following year, on November 16, 2018.

At the time of their marriage, Tereshchenko was 41 years of age and an established, well-to-do international businessman. He frequently travelled internationally, and his office was

located in Dubai at the time of the hearing.  Karimi was 24 years old when they married.

After their divorce, they negotiated a custody agreement (the "Custody Agreement"), which they executed on May 29, 2019. They agreed that the children would reside with the Mother and maternal grandmother in an apartment in Odesa, which Tereshchenko would purchase.  The Agreement provided that the children would reside with their Father for at least seven days per month and that the Father could "freely visit" the children and participate in their upbringing.

Beginning in early 2019, Karimi began to travel for extensive periods of time, spending more than half of her time away from Odesa.  She moved to London at one point to earn a Masters Degree in "magazine journalism".  Eventually, the children came to live with their Father and his mother.  The parents began to file criminal complaints against each other and claims for custody.

On October 11, 2021, the Children's Service of Odesa City Council determined that the children were to reside with their Father in Odesa ("Guardianship Ruling").  The two-page Ruling bears the heading "Conclusion" and reflects that the Mother's representative failed to appear at hearings scheduled for September 16 and October 7.

Shortly after the ruling had awarded custody to the children's Father, the Mother abducted the children and took them to an undisclosed location in Odesa.   Tereshchenko reported the abduction to the police, and the children were placed on a "wanted list".   It would be almost two years before the Father was able to visit his children again.   This occurred after he located them in New York and filed the instant petition.

After Russia invaded Ukraine, Karimi telephoned Tereshchenko and sought access to the children's travel documents so that she could take them out of the country.   At that time, Tereshchenko was out of the country.   He agreed to provide her with those documents, which were delivered by his representative, but asked that the children be brought to him in Dubai, where he had a home.   That did not happen.   Using the travel documents provided by Tereshchenko, Karimi took the children to Poland on March 2, 2022, and then to the Netherlands and Spain.   On July 11, 2022, she brought them to the United States as part of the U.S. Department of Homeland Security's "Uniting for Ukraine" program.   At no point after her arrival in the United States did Karimi contact Tereshchenko or take any steps to notify him that she had taken the children to the United States or to advise him where the children could be found.

4

Tereshchenko applied to law enforcement agencies and international organizations in an effort to locate his children. Interpol issued Yellow Notices for the children in August 2022. In March 2023, with assistance of the U.S. State Department, Tereshchenko located an address for Karimi in New York City. This petition was filed on March 8, 2023.

Initially, Karimi evaded service.  She eventually appeared at a conference on June 9, 2023.  The parties agreed to mediate their dispute over the summer and when that failed, to wait for a decision by the District Court of the City of Odesa ("District Court") on where they children should reside.  Meantime, the parties briefed the respondent's motion to dismiss, which was denied.  Tereshchenko v. Karimi, No. 23cv2006 (DLC), 2023 WL 8452224 (S.D.N.Y. Dec. 6, 2023).

On November 21, 2023, the District Court issued its decision, ruling that the children are to reside with Tereshchenko ("District Court Decision").  In a lengthy opinion, the District Court reviewed the evidence submitted and found that Karimi had repeatedly violated the terms of the Custody Agreement, had evaded her responsibilities, and had been frequently absent due to her foreign travels.  It reported that she had refused to give the court certain information in

response to its questions.  Karimi reports that she has appealed the decision.

Although Karimi and Tereshchenko had agreed to abide by the decision of the District Court, Karimi changed counsel after the District Court ruled against her and continues to oppose the petition.  At a conference on December 13, a hearing was scheduled for January 3, 2024.  Following December 13, the parties engaged in further discovery and filed their submissions for the hearing.  As described below, in her submissions in advance of the hearing, Karimi's counsel asserted affirmative defenses not pleaded in her answer.

Pursuant to this Court's customary procedures for non-jury hearings and trials, and without objection by the parties, the direct testimony of the hearing witnesses was presented through affidavits exchanged before the hearing.  Five witnesses testified in person or through a video link at the January 3 hearing and were subject thereby to cross and redirect examination.  Tereshchenko and Karimi testified in person, as well as the man with whom Karimi currently lives in New York, Stanislav Vitiuk.  The experts for the petitioner and respondent testified via video link from Ukraine.  The affidavits of two additional witnesses for the petitioner, Valentyna Sharapaieva and Bogdana Kovchuzhnaya, were received as their direct

testimony, and the respondent declined to cross examine them. Sharapaieva is the children's paternal grandmother and Kovchuzhnaya provided negative information about Karimi's past life.

At the conclusion of the hearing, the Court granted the petition and the parties have been discussing since that time how the children will be transferred to the Father's custody to live in France.  Those discussions remain ongoing.

### Discussion

Tereshchenko brings this petition under the Hague Convention, as implemented by the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001 et seq. ("ICARA") and seeks an order directing the return of his minor children.  Both Ukraine and the United States are signatories to the Hague Convention.

The objectives of the Hague Convention are:

(a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

Hague Convention, Art. 1.  Courts presiding over Hague Convention petitions "should make every effort to honor simultaneously the Convention's commitments (1) to the return of wrongfully abducted children to their home countries, for custody adjudication by courts there with proper jurisdiction,

and (2) to safeguarding the children from 'grave risk' of harm."

Blondin v. Dubois, 189 F.3d 240, 242 (2d Cir. 1999).

Article 3 of the Hague Convention states that the removal or retention of a child is wrongful where

> it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and [a[t the time of removal or retention those rights were actually exercised, either jointly or alone, and would have been so exercised but for the removal or retention.

Hague Convention, Art. 3.  The removal or retention of children is wrongful where it "disregarded" the lawfully protected rights of a parent and interferes with the normal exercise of those rights.  Ozaltin v. Ozaltin, 708 F.3d 355, 369 (2d Cir. 2013) (citing the Perez-Vera Report[1] at 447-48).  Where the removal or retention is wrongful, the child must ordinarily be returned "forthwith."  Hague Convention, Art. 12.

Under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained.  22 U.S.C. § 9003(e)(1).  To establish his prima facie case,

---

[1] The Perez-Vera Report describes the proceedings that led to adoption of the Hague Convention.  E. Perez-Vera, Explanatory Report, in Acts and Documents of the Fourteenth Session (1980), p. 425-473.

petitioner must demonstrate, by a preponderance of the evidence, that:

> (1) the child was habitually resident in one State and has been removed to or retained in a different State;
> (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and
> (3) the petitioner was exercising those rights at the time of the removal or retention.

Marks v. Hochhauser, 876 F.3d 416, 418-19 (2d Cir. 2017) (citation omitted).

In determining a child's habitual residence, courts "inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared, considering both actions and declarations." Saada v. Golan, 930 F.3d 533, 539 (2d Cir. 2019) (citation omitted). At bottom, "this inquiry is designed simply to ascertain where a child usually or customarily lives." Id. (citation omitted).

The Hague Convention uses the "unadorned term 'rights of custody' to recognize 'all the ways in which custody of children can be exercised.'" Abbott v. Abbott, 560 U.S. 1, 19 (2010) (citing the Perez-Vera Report at 447-48). Under Article 5 of the Hague Convention, rights of custody include "rights relating to the care of the person of the child, and, in particular, the right to determine the child's place of residence." Hague

Convention, Art. 5.  Custody rights are "provided by the law of the State in which the child was habitually resident immediately before the removal or retention, including by a judicial or administrative decision." Ermini v. Vittori, 758 F.3 153, 163 (2d Cir. 2015) (citing Hague Convention, Art. 3).

When evaluating petitions brought under the Hague Convention, courts may consider the reliable opinions of experts versed in relevant foreign law.  These expert opinions can consist of interpretations of foreign law, as well as interpretations of relevant foreign judicial or administrative orders.  See Ozaltin, 708 F.3d at 370.

The parties agree that the children were habitual residents of Ukraine.  They also agree that the law of Ukraine governs the rights of custody over the children and that under that nation's Family Code both parents have the right to participate in the decisions regarding where the children reside and the major decisions regarding their lives, such as their medical care and education.  These rights survive a divorce.  Neither parent may impede the other's communication with the child, provided that the parent's involvement with the child does not impair the child's development.  These parental rights exist even when the child resides with just one parent.

Under Ukrainian law, parents may agree on the residence of a child without court approval. If they are no longer in agreement or are unable to reach a new agreement, either parent may apply to the local Guardianship Body or court to resolve the dispute over the child's residence. If an application is made to the court, then in the normal course, any prior application to the Guardianship Body is stayed and the court submits its own request to the Guardianship Body for a recommendation. If the court rejects that recommendation, it must explain its reasons for doing so. Any court ruling is stayed pending appeal.

The petitioner has carried his burden of showing a breach of the Convention by the respondent. Karimi has interfered with Tereshchenko's rights of custody since November 2021, when she abducted the children and took them to an undisclosed location. While Tereshchenko cooperated with the Karimi to allow the children to leave Ukraine when the Russian war with Ukraine made it unsafe for them to remain in Odesa, he has shown that thereafter Karimi prevented him from exercising his rights under the Ukrainian Family Code to be involved in decisions regarding the children's residence, medical care, and education and to communicate with his children. She did not take them to Dubai, as he had requested, and unilaterally made the decision regarding where they children would be taken. She did not

inform him that she had taken them to the United States. Following the abduction of his children, Tereshchenko attempted through filings with authorities in Ukraine and then with international bodies to find his children.  In 2023, he was able to locate them in New York.  He thereafter brought this action to regain access to and custody of his children.  The petitioner has therefore shown that he was exercising or attempting to exercise his rights of custody throughout this period and that the respondent has interfered with his rights of custody under the Ukrainian Family Code.

As noted above, the Guardianship Ruling and the District Court Decision have both decided that the children should live with their Father.  It is unnecessary to resolve the parties' dispute regarding whether Karimi's actions have violated the petitioner's rights pursuant to the Guardianship Ruling and the District Court Decision.  The petitioner has shown that Karimi's actions in abducting the children and taking them to locations that she did not disclose to the petitioner, including to the United States, have interfered with his rights of custody under the Ukrainian Family Code.  That is sufficient to show the wrongful removal and retention required by the Hague Convention.

The parties' dispute over the legal ramifications of the Ruling and Decision can be briefly stated.  Karimi argues that

the Custody Agreement is the only binding agreement on custody.
She asserts that the Guardianship Ruling should not have been
issued because its right to act was stayed by force of law once
Tereshchenko filed his action with the court.  She argues as
well that the District Court Decision is automatically stayed
because she has appealed it.  This and other arguments[2] for
ignoring the Decision have little weight since she had agreed
during the course of the instant litigation to abide by the
decision of the District Court.  Relying on that representation,
the petitioner agreed to delay the hearing on his Hague
Convention petition.

Tereshchenko, for his part, has offered persuasive evidence
that under the law of Ukraine, the Custody Agreement lost all
force once the parties were no longer willing to abide by it.
Thereafter, both parties made applications to Ukrainian
authorities to gain custody over the children.  The petitioner
has shown as well that the Guardianship Ruling went into effect
at the time it was issued and has remained in effect since the
District Court Ruling accepted it.  Thus, since October 2021,
Ukrainian authorities have formally awarded custody of the
children to their Father.  But, as already described, because

---

[2] Karimi also attacks the District Court Decision by attacking
the character of the judge who issued the Decision.

Tereshchenko has shown that Karimi violated his rights of custody under the Ukrainian Family Code, the fact that she has also refused to comply with the Guardianship Ruling is immaterial to the decision rendered on this petition.

I.   Affirmative Defenses

Once the petitioner has established that removal or retention was wrongful, the child must be returned unless the respondent can establish that one of the Hague Convention's affirmative defenses applies.   Ermini, 758 F.3d at 161; see also 22 U.S.C. § 9003(e)(2).   These defenses, or "exceptions," are "to be construed narrowly."   Ermini, 758 F.3d at 161.   The exceptions "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent."   Blondin, 189 F.3d at 246.   And, even where a defense has been proved, a court retains discretion to return a child "if return would further the aims of the Convention."   Id. at n.4 (citation omitted).

In her answer to the Petition, the respondent relied on the two affirmative defenses set forth in Articles 13b and 20 of the Hague Convention.   On January 1, 2024, the respondent, in her response to the petitioner's motion in limine to exclude evidence, raised two new defenses under Articles 13 and 13a of the Hague Convention.   On the eve of the January 3 hearing, she

argued as well that the children are "now settled" in the United States, as described in Article 12 of the Hague Convention.  The respondent has not carried her burden as to any of these defenses.

 A.   Article 13b

 The respondent's chief defense has been that a return to Ukraine would pose a grave risk to the children.  She must show by clear and convincing evidence that this defense, which is available under Article 13b of the Hague Convention, applies. 22 U.S.C. § 9003(e)(2)(A).

 Article 13b provides that a court is not bound to order the return of a child if the person opposing the return establishes that "[t]here is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention, Article 13b.  The potential harm to the child must be "severe" and the "level of risk and danger required to trigger this exception has consistently been held to be very high." Souratgar v. Lee, 720 F.3d 96, 103 (2d Cir. 2013).  A grave risk of harm under Article 13(b) arises in two situations:

> (1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

Id. (citation omitted).

The grave risk of harm must be particular to the child, not just a general undesirable condition.  Friedrich v. Friedrich, 78 F.3d 1060, 1067-69 (6th Cir. 1996).  The U.S. State Department instructs that the grave risk of harm or "intolerable situation" is not intended to encompass return to a home where living conditions are less than ideal or unlike the living conditions in the country to which the children have been brought.  Public Notice 957, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986).

The respondent has failed to show that a return of the children to Ukraine would involve the grave risk of harm contemplated by Article 13(b).  Tereshchenko has represented that, if required by the Court, he would move with the children to a location in western Ukraine that is outside the zone of combat and danger.  This offer is sufficient to defeat the Article 13(b) defense.  In 2022, after Russia had begun its war with Ukraine, a court in the United Kingdom ordered the return of a child to a town in western Ukraine, finding that the risk of armed conflict was lower than the Article 13b "grave risk of harm" threshold.  Q v. R, (2022) EWHC 2961 (Fam) at ¶¶ 56-66. In any event, as further described below, the Court will not require Tereshchenko to return to Ukraine.

16

B.   Article 20

Making essentially the same argument about the danger posed by a return to Ukraine during a period of war, the respondent relies next on Article 20 of the Hague Convention.  She bears the burden of proving by clear and convincing evidence that this exception applies.  22 U.S.C. § 9003(e)(2)(A).

Article 20 provides that "[t]he return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  Hague Convention, Art. 20.  The Article 20 defense is "to be invoked only on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process."  Lee, 720 F.3d at 108 (citation omitted).  It is not to be used "as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed."  Id. (citation omitted).

For the reasons just explained, the return of the children to western Ukraine would not constitute that rare occasion when the return of the children to the Father's custody would shock the conscience.  Therefore, this defense fails.

17

C.   Article 12

On the eve of the hearing, the respondent introduced a new argument.  She sought to show that the children are "now settled" in the United States, as that term is described in Article 12 of the Hague Convention.  The respondent must show by a preponderance of the evidence that this defense applies.  22 U.S.C. § 9003(e)(2)(B).

Article 12 provides that

> if the proceedings have been commenced less than one year
> from the date of the wrongful removal or retention, the
> authority concerned shall order the return of the child
> forthwith; however, even where the proceedings have been
> commenced after the expiration of the period of one year,
> judicial or administrative authorities shall order the
> return of the child, unless it is demonstrated that the
> child is now settled in its new environment.

Hague Convention, Art. 12.  See Gitter v. Gitter, 396 F.3d 124, 136 n.12 (2d Cir. 2005).  The "now settled" exception "only applies where the child has been in the destination state for more than one year from the date of the wrongful removal or retention." Hofmann v. Sender, 716 F.3d 282, 295 (2d Cir. 2013).  Moreover, the one-year time period begins to run from the date on which the petitioner "was on notice that he was prevented from exercising his custody rights." Id. at n.6.

At the beginning of the January 3 hearing, the Court granted the petitioner's motion in limine to strike this defense.  There were several reasons for that ruling.  The

petitioner was prejudiced by the respondent's failure to identify this as a defense until the eve of the hearing. Indeed, the petitioner's motion in limine was not triggered by any explicit invocation of this defense, but by the inference the petitioner drew from the respondent's hearing exhibits.  He inferred, correctly, that she might seek to rely on this defense.

It was also denied on the merits.  The relevant facts are quickly stated.  While the respondent removed the children from Ukraine to Poland on March 2, 2022, they did not enter the United States until July 11, 2022.  The petitioner filed this action on March 8, 2023.  Thus, to the extent the one-year period begins to run from the date at which the children arrive in the country in which they have arguably been "now settled", this action was filed well within that one-year period.

And, even if the period begins to run from the date at which the Father should have understood that Karimi would prevent him from exercising his parental rights, Karimi has not shown that this action was not filed within that one-year period.  It is undisputed that Tereshchenko wanted the children to be taken to Dubai after they left Ukraine.  The children did not leave Ukraine via Poland until March 2.  The respondent has not shown that Tereshchenko should have understood by March 8,

just six days later, that Karimi would not take them to Dubai and would instead continue to deprive him of access to them. Thus, this defense has been forfeited[3] and also fails on the merits.

        D.   Article 13a

        Respondent relies as well on Article 13a of the Hague Convention, which provides a defense of consent and acquiescence.   The respondent bears the burden of proving by a preponderance of the evidence that this defense applies.   22 U.S.C. § 9003(e)(2)(B).

        Article 13a provides an exception to the return of a child if the person opposing the return establishes that "[t]he person . . . having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention."   Hague Convention, Art. 13.

> [T]he defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow.   The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention.

---

[3] "The term 'waiver' is best reserved for a litigant's intentional relinquishment of a known right.   Where a litigant's action or inaction is deemed to incur the consequence of loss of a right, or, as here, a defense, the term 'forfeiture' is more appropriate."   Carroll v. Trump, 88 F.4th 418, 422 n.1 (2d Cir. 2023) (citation omitted).

<u>Baxter v. Baxter</u>, 423 F.3d 363, 371 (3d Cir. 2005) (citation omitted).  When evaluating a consent defense, a court must consider the "nature and scope of the petitioner's consent, and any conditions or limitations."  <u>Id.</u>  A petitioner's initial consent to a child's travel "does not necessarily constitute consent to removal or retention under the Convention."  <u>Id.</u> "Acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time."  <u>Friedrich</u>, 78 F.3d at 1070 (citation omitted).

Karimi argues that the petitioner consented to her removing the children from Ukraine.  She points to his assistance in providing her with their travel documents so she could take the children out of the country after the war broke out.  This consent was narrow.  Karimi has failed to show that Tereshchenko consented at any time to her taking the children to undisclosed locations, including the United States, or interfering with his access to them.

Karimi relies as well on the parties' WhatsApp messages, exchanged after Tereshchenko had located his children and filed the instant petition.  She contends that in these messages the

Tereshchenko consented to the children remaining in the United States with Karimi.  These messages, which span the period from May 19 to June 22, 2023, do not assist Karimi.  They principally reflect the Father's interest in resolving these issues through a settlement agreement to avoid the expense and delay of court proceedings and the Mother's efforts to get him to admit to past misconduct.  Nothing in this exhibit suggests that Tereshchenko consented to the removal of the children by their Mother from Ukraine to undisclosed locations and other actions which prevented him from communicating with them and being involved in their lives.  To the contrary, in these messages he repeatedly asserts that children need both a father and mother and that he wants to be a responsible parent.

     E.   Article 13

     Finally, on the eve of the hearing, the respondent referred in passing to the mature child provision of Article 13.  This provision states that

> [t]he judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

Hague Convention, Art. 13.

     This provision does not apply to Karimi's children, the oldest of whom is seven years of age.  "Children who are neither

over sixteen nor of an age and degree of maturity at which it is appropriate to take account of their views are clearly not in a position to make independent choices as to where they wish to reside." <u>Gitter</u>, 396 F.3d at 132 n.7 (citation omitted); <u>see also</u> <u>Blondin</u>, 189 F.3d at 246 n.3.  Moreover, Karimi did not pursue this defense at the hearing.

## II.  Return to Third Country

Finally, the respondent argues that petitioner may only seek the return of his children to Ukraine, and not to France. This argument fails.  When a petitioner has succeeded in his claim, it may be appropriate to restore the children to him at his current residence even when that residence is not in the country that was the children's habitual residence.  In the circumstances that exist here, that is certainly appropriate.

The purpose of the Convention, as stated in the preamble, is to return a child to their country of habitual residence for resolution of any custody dispute.

> The States signatory to the present Convention . . .
> [d]esiring to protect children internationally from the
> harmful effects of their wrongful removal or retention and
> to establish procedures to ensure their prompt <u>return to</u>
> <u>the State of their habitual residence</u> . . . have agreed
> upon the following provisions.

Hague Convention, Preamble.  The Supreme Court and the Second Circuit have regularly observed that the remedy under ICARA is the "prompt return" of children "to the child's country of

23

habitual residence." Golan v. Saada, 596 U.S. 666, 670 (2022);

see also Chafin v. Chafin, 568 U.S. 165, 168 (2013); Lee, 720

F.3d at 101–02; Mota v. Castillo, 692 F.3d 108, 112 (2d Cir.

2012).  None of these cases, however, addressed whether a court,

in ordering the return of a child to a parent, may order that

the return be to a parent's current abode in a third country.

And, apart from the Preamble, no other provision of the

Convention refers to the return of the child to the state where

they were once habitually resident.  Article 12, which requires

the "forthwith" return of the child, requires only that the

authority granting the petition order "the return" of the child.

Hague Convention, Art. 12.

     In describing its drafting history, the Perez-Vera Report

notes that the drafters of the Hague Convention considered the

place to which the child had to be returned.  Ultimately, the

Hague Convention "did not accept a proposal to the effect that

the return of the child should always be to the State of its

habitual residence before its removal."  Perez-Vera Report at

459.  They concluded that such an inflexible rule would be

"useless."  Id.  In their view, such a rigid rule "might cause

practical problems which would be difficult to resolve."  Id.

The Hague Convention, therefore, does not require that a child

be returned to the state of its habitual residence.  While, as

reflected in the Preamble, a return to the habitual residence will be the outcome in the ordinary case, it is not required by the body of the Convention.

This reading of the Hague Convention is consistent with our Government's reading of the document.  The United States State Department recognizes that a child does not need to be returned to the state of its habitual residence.  In its legal analysis of Article 12, the U.S. State Department notes, "[t]he Convention does not technically require that the child be returned to its State of habitual residence . . . .  If the petitioner has moved from the child's State of habitual residence the child will be returned to the petitioner, not the State of habitual residence."  Public Notice 957, 51 Fed. Reg. at 10511.

A decision issued recently in the United Kingdom has addressed this very issued and opined that the Hague Convention permits a court, in the exercise of its discretion, to return a child to a parent now living in a third state.  In Re B (A Child), (2020) EWCA Civ. 1187, at ¶ 104.  In In Re B, Lord Moylan explained that the Hague Convention did not accept "a proposal to the effect that the return of the child should always be to the State of its habitual residence."  Id. at ¶ 108 (citing the Perez-Vera Report).  Lord Moylan further opined that

"to confine the terms of Article 12 to permitting a return only to the state of habitual residence at the relevant date would not promote the objectives of the [Hague Convention]." Id. at ¶ 110.

Where a petitioner no longer lives in what was once the child's habitual residence, it makes little sense, and is contrary to the protections of the child from the harmful effects of abduction, to order the return of the child to a country in which the petitioner no longer lives. Here, Ukraine's current laws provide additional support for this outcome. They allow a relative to unilaterally remove a child from Ukraine. In response to the war with Russia, the Executive Order of March 21, 2022 states that a child under the age of 16, accompanied by "one of [their] parents, grandparents, brother, sister, stepmother or stepfather" or another person authorized by one of the parents in a written statement certified by the Guardianship Body, may leave Ukraine upon presentation of documents containing information about the person accompanying the child. On Approval of the Rules of Crossing the State Border by Citizens of Ukraine, Ministry of Social Policy of Ukraine.[4]

---

[4] Exiting Ukraine as children and teenagers, United Nations High Commissioner for Refugees, https://help.unhcr.org/moldova/entering-moldova-as-a-

The petitioner seeks to relocate the children to his home in France. Even if the Court required the children to be taken to him in Ukraine, Ukrainian law permits him, because of the exigencies of the war, to take them immediately to live with him in France. It would elevate form over substance, in these circumstances, to require him to take the children into Ukraine before he could take them to his home in France. It would also add to the children's trauma. That trauma can and should be avoided.

### Conclusion

The petition filed by Roman Tereshchenko on March 8, 2023 is granted. The respondent shall cooperate fully with the forthwith return of the children to their Father to reside in his home in France.

Dated:    New York, New York
          January 8, 2024

                              _____
                              DENISE COTE
                              United States District Judge

---

teenager/exiting-ukraine-as-children-and-teenagers/, citing Note regarding the crossing of state borders by children, Terre des Hommes, https://childhub.org/en/child-protection-online-library/note-regarding-crossing-state-borders-children-persons-disabilities-and-persons-accompanying-them-state-emergency-or-martial-law?language=ro