24-172
*Tereshchenko v. Karimi*

# In the
# United States Court of Appeals
## For the Second Circuit

———————

August Term, 2023

(Argued: March 19, 2024    Decided: May 16, 2024)

Docket No. 24-172-cv

———————

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 16 2024

ROMAN TERESHCHENKO,

*Petitioner-Appellee,*

–v.–

YASAMIN KARIMI,

*Respondent-Appellant.*

———————

B e f o r e :

CARNEY, SULLIVAN, and LEE, *Circuit Judges.*

———————

Yasamin Karimi, a Ukrainian citizen, appeals the grant of a petition brought by her former husband, Roman Tereshchenko, also a Ukrainian citizen, for return of their two children. Tereshchenko filed his petition under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986) ("Hague Convention" or "Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, *as amended*, 22 U.S.C. § 9001 et seq. Immediately after Russia's invasion of Ukraine on February 24, 2022, Tereshchenko agreed to have Karimi remove

the children from Ukraine, their place of habitual residence, for safety reasons, but requested that she come with the children to him in Dubai, where he has a home and an office. Karimi then brought the children to locations that she did not disclose to Tereshchenko, including in July 2022 to the United States. Following a hearing on January 3, 2024, the District Court (Cote, *J.*) granted Tereshchenko's petition and ordered the children returned to Tereshchenko at his current residence in France.

We reject Karimi's challenge to the District Court's subject matter jurisdiction over Tereshchenko's petition. We further conclude that Tereshchenko proved a prima facie case of wrongful removal or retention under Article 3 of the Convention, and we identify no abuse of discretion in the District Court's decision to exclude Karimi's proffered evidence relating to Article 12's "now settled" defense. We find error, however, in the District Court's determination that the children would not be exposed to a grave risk of harm if they were returned to western Ukraine. Nevertheless, and in part because of that grave risk of harm, we conclude that this is one of the rare cases in which the Convention permits—as a temporary ameliorative measure—a district court to order the return of the children not to their place of habitual residence but to the petitioner in a third country. We therefore affirm the District Court's order to that extent. Because its order was not adequately tailored to maintain the Ukrainian courts' authority over an ultimate custody determination and to avoid effecting an impermissible custody order, we remand for the District Court to modify the order accordingly. Thus, we AFFIRM IN PART, and REMAND the case for further expeditious proceedings consistent herewith.

———————

MICHAEL BANUCHIS, Green Kaminer Min & Rockmore, LLP, New York, NY (Richard Min, Green Kaminer Min & Rockmore, LLP, New York, NY; Daniel Lipschutz, Aronson Mayefsky & Sloan, LLP, New York, NY, *on the brief*), *for Petitioner-Appellee*.

KAREN R. KING, Morvillo Abramowitz Grand Iason & Anello PC, New York, NY (Jeremy D. Morley, The International Family Law Office of Jeremy D. Morley, New York, NY, *on the brief*), *for Respondent-Appellant*.

———————

CARNEY, *Circuit Judge*:

Respondent-Appellant Yasamin Karimi, a Ukrainian citizen now present in New York, appeals the grant of a petition brought by her former husband, Petitioner-Appellee Roman Tereshchenko, also a Ukrainian citizen, for return of their two children. Tereshchenko brought his petition under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986) ("Hague Convention" or "Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, *as amended*, 22 U.S.C. § 9001 et seq.

In February 2022, immediately after Russia's invasion of Ukraine, Tereshchenko agreed to have Karimi remove the children from Ukraine, their place of habitual residence, for safety reasons. In giving that consent, he requested that they be brought to him in Dubai, where he has a home and an office. Karimi ignored that request, took the children to locations that she did not disclose to Tereshchenko, including in July 2022 to the United States. Following a hearing on January 3, 2024, the District Court (Cote, *J.*) granted Tereshchenko's petition and ordered the children returned to Tereshchenko at his current residence in France.

The principal issues on this expedited appeal are whether the District Court: erred in concluding that it had jurisdiction and that Tereshchenko had proved his prima facie case of wrongful retention; abused its discretion by excluding Karimi's proffered evidence relating to Article 12's "now settled" defense; erred in determining that the children would not be exposed to a grave risk of harm if returned to western Ukraine; and acted within its authority in ordering the children returned to Tereshchenko not in Ukraine, but at his current residence in France.

Upon due consideration, we affirm the District Court's ruling insofar as it exercised subject matter jurisdiction over Tereshchenko's petition; concluded that

Tereshchenko proved his prima facie case of wrongful removal or retention under
Article 3 of the Convention; excluded Karimi's evidence related to the "now settled"
defense; and directed Karimi to return the children to Tereshchenko at his residence in
France. Although we further conclude that the District Court erred in determining
under Article 13(b) that no grave risk of harm would result from returning the children
to western Ukraine, we also decide that the District Court correctly granted the petition
and entered a return order in Tereshchenko's favor. The order it entered, however, was
not adequately tailored to preserve the authority of the Ukrainian courts over the
parties' custody dispute and to avoid effecting an impermissible custody order. The
order is thus affirmed in part and the case remanded to allow the District Court to
amend its order returning the children to Tereshchenko in France by adding conditions
designed to serve this important purpose.

We therefore **AFFIRM IN PART** and **REMAND** the case for further proceedings
consistent with this opinion.

## BACKGROUND

### I.  Factual Background

Except where otherwise noted, the following factual statement is based on
findings made by the District Court. *See generally Tereshchenko v. Karimi*, 2024 WL 80427
(S.D.N.Y. Jan. 8, 2024).

Tereshchenko and Karimi married in Odesa, Ukraine, on April 22, 2017. They are
the parents of M.T. and K.T. M.T. was born on March 27, 2016, in Kyiv, Ukraine, and is
a citizen of Ukraine; K.T. was born on June 3, 2017, in Hollywood, Florida, and is a
citizen of Ukraine and of the United States. J. App'x at 468.

A.    <u>The parties divorce and dispute custody.</u>

The parties divorced on November 16, 2018. In January 2019, Karimi began to travel for extended periods of time, spending more than half of her time away from Odesa, where she was then residing with the children. Tereshchenko, while apparently based in Odesa, frequently travels internationally for work and maintains an office and residence in Dubai.

In May 2019, the parties executed a custody agreement under which the children would reside with Karimi and Tereshchenko would "freely visit" with them and participate in their upbringing. *Id.* at 750. Some months later, in the fall of 2019, Karimi moved to London to seek a master's degree in journalism from City, University of London, leaving the children with her mother in Odesa. *Id.* at 478. Beginning in June 2020, however, the children began to reside primarily with Tereshchenko.

By November 2020, the parties had begun a legal contest over their custody arrangements. Tereshchenko sought to modify the May 2019 agreement and to have the children reside primarily with him; Karimi, for her part, sought sole custody. In October 2021, the Children's Service of Odesa City Council (the "Guardianship Body") determined that the children would reside with Tereshchenko in Odesa.

Shortly after, on November 22, 2021, when Tereshchenko was undergoing medical treatment abroad and the children were staying at his home under the care of their paternal grandmother and nannies, Karimi came to Tereshchenko's home and took the children, promising that she would return them the following morning. When she failed to do so, Tereshchenko reported the abduction to the police and the children were placed on a "wanted list." *Id.* at 1162. Tereshchenko was unable to visit his children again until after he located Karimi and the children in New York City and filed this proceeding.

B.    <u>Russia invades Ukraine and Karimi eventually arrives with the children in the United States.</u>

The children were with Karimi at an undisclosed location in Odesa when, on February 24, 2022, Russia invaded Ukraine. On February 25, Karimi contacted Tereshchenko in Dubai by phone and requested that he have the children's passports delivered to her so that she and the children could quickly leave the country.

Tereshchenko agreed, but he also asked that the children be brought from Ukraine to him in Dubai. According to Tereshchenko, he asked Karimi to notify him when they reached the intermediate stop of Moldova. *Id.* at 415. The plan was that he would then purchase plane tickets for Karimi and the children to travel to Dubai. *Id.*

That did not occur. Instead, Karimi left Ukraine with the children and, on March 2, took the children to Poland. From there, the three traveled to the Netherlands and, eventually, to La Manga, Spain, where they stayed for about three months. On July 11 of that year, Karimi brought the children to the United States under the auspices of the U.S. Department of Homeland Security's "Uniting for Ukraine" program. The humanitarian parole status established by that program is set to expire a few months from now, in July 2024. *Id.* at 368, 1068.[1]

---

[1] The parties continue to dispute whether Tereshchenko was able to contact his children or knew where they were after they left Ukraine and before they came to the United States. At oral argument in this Court, counsel for Karimi contended that Tereshchenko knew that the children had traveled to Poland, the Netherlands, and Spain and that, during that time, he was "in contact with [them]." *See* Oral Arg. Tr. at 6–7. In the District Court proceedings, Tereshchenko testified in contrast that he was unable to have any contact with Karimi (and thus, with the children) during this time because she had "turned off all [her] phones" and "deleted herself from all networks." J. App'x at 274. Karimi conceded that she never informed Tereshchenko that she had taken the children to the United States. *Tereshchenko*, 2024 WL 80427, at *1; *see* J. App'x at 325 (Karimi so testifying).

At no point did Karimi advise Tereshchenko that she had taken the children overseas, to the United States. Thus shut out, Tereshchenko began to hunt for the children, requesting in August 2022 through the Ukrainian police that Interpol issue "Yellow Notices" for them.[2] Meanwhile, he remained in Dubai until April 16, 2022; then, after spending about one month in Malaga, Spain, he moved to France in around May 2022. *Id.* at 416. He has been living in a rented three-bedroom home in Antibes since October 2022. *Id.* at 416, 985–1001.

With "the assistance of international authorities and then the U.S. Department of State," Tereshchenko eventually was able to determine that Karimi and the children were likely living in Manhattan. *Tereshchenko v. Karimi*, 2024 WL 195547, at *1 (S.D.N.Y. Jan. 18, 2024). On March 8, 2023, he filed this petition in the Southern District of New York.

## II.   Procedural History

On March 31, 2023, the Department of State informed Tereshchenko of a possible street address for Karimi in Manhattan. In May, Karimi repeatedly evaded attempts at service. Service was successful only after a May 26 order by the District Court allowed a process server to affix the pleadings to the door of the apartment found at the address identified by the State Department.

Karimi appeared with counsel at a June 9 hearing set by the District Court. At that conference, the District Court issued a scheduling order, directing Karimi to

---

[2] "A Yellow Notice is a global police alert for a missing person. It is published for victims of parental abductions, criminal abductions (kidnappings) or unexplained disappearances." Interpol, *Yellow Notices*, https://www.interpol.int/en/How-we-work/Notices/Yellow-Notices [https://perma.cc/62UY-DUAB] (last visited April 16, 2024). For a Yellow Notice to be published, police in a country that is a member of Interpol must file a request and provide Interpol with the relevant information. *See id.*

answer the petition and to file any motions to dismiss by June 19. The parties' briefs were to be submitted not long after, and an evidentiary hearing was scheduled to be held on June 30, in keeping with the Convention's directive for expeditious action.

No motion to dismiss was filed by June 19 as it was a federal holiday, but on June 20, with the court's permission, new counsel for Karimi moved to dismiss for lack of subject matter jurisdiction.[3] She filed her answer on June 21, as ordered by the court. In it, she admitted that she and the children left Ukraine "in or around March 2022" and that the children had been residing in the United States since July 11, 2022. J. App'x at 148. She also asserted three affirmative defenses recognized by the Convention: (1) *under Article 13(a)*, that Tereshchenko "consented" to the children's removal and her retention of them; (2) *under Article 13(b)*, that the children's return to Ukraine would pose a "grave risk" of harm to them or otherwise place them "in an intolerable situation"; and (3) *under Article 20*, that their return would not be permitted by the "fundamental principles" of the United States "relating to the protection of human rights and fundamental freedoms."

As it turned out, the District Court converted the scheduled June 30 evidentiary hearing to a combined oral argument and pretrial conference because Tereshchenko was unable to obtain a visa permitting him to travel to the United States at that time.

A.    The parties attempt mediation and the Ukrainian Court issues a ruling.

Meanwhile, in early June, before the motion to dismiss was filed and while the other proceedings were pending, the District Court referred the parties to mediation. The District Court found that during mediation the parties agreed that, if mediation failed, they would await and abide by the expected custody decision of the District

---

[3] The record reflects that new counsel appeared for Karimi on June 15.

Court of the City of Odesa (the "Ukrainian Court"). *See Tereshchenko*, 2024 WL 195547, at
*1.

The parties participated in a final mediation session on August 25, having
reached no agreement. On October 20, while still awaiting the Ukrainian Court
decision, Karimi and Tereshchenko requested that the District Court proceed to decide
Karimi's motion to dismiss.

The District Court had not yet ruled on that motion when, on November 21, the
Ukrainian Court announced its custody decision. It ruled, as had the Guardianship
Body, that the children were to reside with Tereshchenko, and that they were to do so at
a specific address in Odesa. Contrary to her earlier agreement, however, Karimi did not
accept the Ukrainian Court decision; rather, on December 19, she filed an appeal. That
appeal stayed both that decision and the decision of the Guardianship Body.

B.      The District Court rules in favor of Tereshchenko.

On December 6, the District Court denied Karimi's motion to dismiss for want of
jurisdiction, concluding that the motion improperly conflated questions of jurisdiction
with the petition's merits, and that jurisdiction was adequately established. *See
Tereshchenko v. Karimi*, 2023 WL 8452224, *1–2 (S.D.N.Y. Dec. 6, 2023). On December 13,
Karimi—now represented by her third counsel—stated in conference that she did not
accept the Ukrainian Court's decision and (as previewed above) that she intended to
appeal. Tereshchenko requested an immediate hearing in the District Court to resolve at
last the merits of his petition, which by then had been pending for approximately nine
months.

The District Court set a hearing date on the petition for January 3, 2024. The court
directed Tereshchenko's counsel to provide Karimi's counsel any materials previously
submitted by Tereshchenko to the court in connection with the earlier planned June

2023 hearing on the petition, which had been adjourned because of Tereshchenko's inability to travel to the United States and to allow mediation. It further ordered that direct examinations be submitted by affidavit. It allotted each side 90 minutes to present its case at the January 3 hearing through in-person or streamed cross-examination and redirect, and by submitting documentary evidence. The court gave each party an additional 30 minutes for oral argument after presenting their cases.

On Friday, December 29, having examined some of Karimi's pretrial documentary disclosures, Tereshchenko moved in limine to exclude certain evidence from the January hearing. His motion focused on all proposed exhibits relating to what he inferred would be a new assertion by Karimi that the children were "now settled" in the United States, a defense under Article 12 of the Convention. Karimi opposed on January 1, 2024.

The January 3 hearing was convened as scheduled. The court first ruled on the motion in limine. It excluded the proposed evidence and decided both that Karimi had forfeited the "now settled" defense and that the defense failed on the merits. The court also excluded some of Karimi's proposed evidence on the ground that Karimi had not given Tereshchenko's counsel an advance copy and that the court had received physical copies of the exhibits as "a box of documents . . . with nothing stapled, [and] no indication [of] what document was where." J. App'x at 281.

With those preliminary matters addressed, the court heard the cross-examination of five witnesses, including Karimi and Tereshchenko, each of whom had presented direct testimony by affidavit before the hearing.[4] At the end of the day, the court orally

---

[4] The three other witnesses were Katerina Malichenko (Karimi's legal expert); Stansilav Vitiuk (the man with whom Karimi was then living in New York City); and Oksana Voynarovska (Tereshchenko's legal expert). Karimi, Tereshchenko, and Vitiuk were cross-examined in person. The legal experts each submitted to cross-examination by video stream.

granted Tereshchenko's petition and advised that its written decision would soon
follow.

On January 8, the District Court issued its written Opinion and Order. *See
Tereshchenko*, 2024 WL 80427. The court began by noting the parties' agreement that the
children are "habitual residents" of Ukraine within the meaning of the Convention, and
that the Ukrainian Family Code governs the parents' rights vis à vis their children. That
law affords each parent the right to have access to the children and to participate in
major decisions about the children's lives. *See id.* at *4. These decisions expressly include
those regarding where the children will reside and others such as those concerning their
medical care and education. *See id.*

The established law of Ukraine thus made it unnecessary, the court reasoned, for
it to resolve the parties' dispute regarding whether Karimi's actions violated
Tereshchenko's more specific custody rights under either or both of the October 2021
Guardianship Body ruling or the November 2023 Ukrainian Court decision. No more
was needed because Karimi's actions in taking the children to the United States and
retaining them there without notice to him undeniably interfered with Tereshchenko's
rights under the Ukrainian Family Code. Further, this history sufficed to show the
wrongful retention required by the Convention as a predicate to relief. *Id.*

The court then turned to the affirmative defenses advanced by Karimi. It
concluded first that Karimi failed to show by clear and convincing evidence that return
of the children to western Ukraine, if ordered by the court, would result in a grave risk
of harm referred to by Article 13(b). *Id.* at *6. Second, it ruled that Karimi had forfeited
the "now-settled" defense. In any event, it found, the defense failed "on the merits":
Karimi was not entitled to assert the defense under Article 12 because Tereshchenko
could not have known by March 8, 2022, a year before he filed the petition, that Karimi
would not bring the children to Dubai and "would instead continue to deprive him of

access to them." *Id.* at *7. Third, it found that Karimi failed to show by a preponderance that Tereshchenko consented to her taking the children to undisclosed locations including the United States, or to her interfering with his access to the children. This finding negated Karimi's "consent" defense under Article 13(a). *Id.* at *8. Finally, it determined that, under all the circumstances, it was appropriate and lawful for the court to return the children to Tereshchenko at his current residence in France even though France is not the children's country of habitual residence. *See id.* at *8–10.[5] The court thus simply ordered "return of the children to [Tereshchenko] to reside in his home in France." *Id.* at *10.

On January 12, the District Court issued a further order directing Tereshchenko to submit "a plan for returning the children forthwith to petitioner to reside in France," and scheduled a conference for January 18.

C.    Karimi appeals and moves for a stay.

On January 16, Karimi moved the District Court for a stay of proceedings and for entry of judgment, as needed to appeal the decision. On January 18, the District Court denied the stay request and ordered that, absent a stay by this Court, Tereshchenko would take physical custody of the children on January 28 and depart with them to France on or after January 30. *Tereshchenko*, 2024 WL 195547, at *2. Also on January 18, the District Court entered judgment on its January 8 Opinion and Order, permitting this appeal. *See* 28 U.S.C. § 1291.

––––––––––––––––––––––

[5] The District Court also rejected Karimi's argument that returning the children to western Ukraine would violate Article 20 of the Convention "relating to the protection of human rights and fundamental freedoms." *See id.* at *6 (quoting Convention, Art. 20). Karimi does not challenge this ruling on appeal, and we therefore treat the argument as abandoned. *See United States v. Babwah*, 972 F.2d 30, 34 (2d Cir. 1992) ("[A]n argument not raised on appeal is deemed abandoned.").

Karimi noticed her appeal on January 18 and soon moved for expedited consideration and an emergency stay. On January 26, we granted the motion to expedite and entered a temporary stay pending a stay decision by a three-judge panel. On March 11, we denied Karimi's motion for a stay of the District Court's order pending appeal.

On April 15, Karimi filed a letter informing the District Court that the parties had agreed that Tereschenko would take the children to France "on or shortly after April 29, 2024." D. Ct. Dkt. No. 151. We then issued a stay of the District Court's order on April 27, 2024, and ordered that the children shall remain in the United States pending our resolution of this appeal.

## DISCUSSION

On appeal, Karimi argues that (1) this case does not arise under the Convention and therefore the District Court lacked subject matter jurisdiction. She also contends that the District Court: (2) abused its discretion in excluding evidence of the children's settlement in the United States; (3) erroneously concluded that returning the children to western Ukraine would not expose them to a grave risk of harm under Article 13(b); (4) lacked the power under the Convention to send the children to a country that is not their place of habitual residence; and (5) deprived her of a meaningful opportunity to be heard.

## I.     Standard of Review

This Court reviews de novo questions of subject matter jurisdiction. *Landau v. Eisenberg,* 922 F.3d 495, 497 (2d Cir. 2019). In cases arising under the Convention and ICARA, we review a district court's factual findings for clear error and its legal conclusions de novo. *Ozaltin v. Ozaltin*, 708 F.3d 355, 368 (2d Cir. 2013). As to factual findings, our "review under the 'clearly erroneous' standard is significantly

deferential": "[w]e must accept the trial court's findings unless we have a definite and firm conviction that a mistake has been committed." *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013) (internal quotation marks omitted).

We review for abuse of discretion a district court's evidentiary decisions, including its decision to exclude evidence that is subject to a motion in limine. *United States v. Bah*, 574 F.3d 106, 116 (2d Cir. 2009). Again, "the standard is demanding: to find such an abuse we must be persuaded that the trial judge ruled in an arbitrary and irrational fashion." *Torcivia v. Suffolk County*, 17 F.4th 342, 365 (2d Cir. 2021) (internal quotation marks omitted and alterations adopted); *see also Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (a district court abuses its discretion when "its decision rests on an error of law . . . or a clearly erroneous factual finding" or its decision "cannot be located within the range of permissible decisions").

## II.    Hague Convention Framework

The Hague Convention is a multilateral treaty designed "to secure the prompt return of children wrongfully removed to or retained in any Contracting State." *Chafin v. Chafin*, 568 U.S. 165, 168 (2013) (quoting Convention, Art. 1). It aims "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Id.* (quoting Convention, Art. 1). The Convention's "core premise" is that "the interests of children . . . in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Monasky v. Taglieri*, 589 U. S. 68, 72 (2020) (internal quotation marks omitted). The Convention thus addresses both the interests of children who have been wrongfully removed or retained and the interests of the relevant authorities in the Contracting State from which the children have been removed. *See Abbott v. Abbott*, 560 U.S. 1, 20 (2010).

14

Under ICARA, the Convention's implementing statute in the United States, the petitioning party bears the burden of proving by a preponderance of the evidence that the child was "wrongfully removed or retained." 22 U.S.C. § 9003(e)(1)(A). Removal or retention of a child is "wrongful" when:

> *a)* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> *b)* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph *a)* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Convention, Art. 3.

Once a petitioner makes out a prima facie case that removal or retention was wrongful, the court must order the child's prompt return unless the respondent shows that one of the Convention's "narrow" exceptions applies. 22 U.S.C. § 9001(a)(4).

## III.   Subject Matter Jurisdiction

Karimi first argues that the District Court lacked subject matter jurisdiction over Tereshchenko's petition. As observed above, Tereshchenko brought the petition under the Convention, as implemented by ICARA, 22 U.S.C. § 9001 et seq., and seeks an order

directing the "return" of the children. Both Ukraine and the United States are signatories to the Convention.[6]

When applying a treaty, a court must determine whether it has jurisdiction over the case by examining "two levels of judicial power": treaty jurisdiction and domestic jurisdiction. *Smith v. Canadian Pac. Airways, Ltd.*, 452 F.2d 798, 800 (2d Cir. 1971); *see also Campell v. Air Jam., Ltd.*, 863 F.2d 1, 1 (2d Cir. 1988). Treaty jurisdiction is defined by the treaty's provisions themselves, which may "delimit which nation-states' courts can hear a claim arising under the treaty." *Nat'l Union Fire Ins. Co. of Pittsburgh v. UPS Supply Chain Sols., Inc.*, 74 F.4th 66, 74 (2d Cir. 2023) (explaining that certain provisions of the Montreal Convention define its treaty jurisdiction by specifying where actions "must be brought" (internal quotation marks omitted)), *cert. denied sub nom. UPS Supply Chain Sols., Inc. v. EVA Airways Corp.*, 144 S. Ct. 559 (2024). Domestic jurisdiction is governed by our usual rules—such as Article III and jurisdictional statutes—that specify whether a "particular United States court" has "power" to hear a case. *Smith*, 452 F.2d at 800 (pointing to the federal-question statute, 28 U.S.C. § 1331(a), as an example of a domestic jurisdictional limit). If either type of jurisdiction is lacking, then the district court must dismiss the suit for lack of jurisdiction.[7]

---

[6] *See* U.S. Hague Convention Treaty Partners, United States Department of State, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html [https://perma.cc/CFP2-AVGT] (last visited April 16, 2024).

[7] As we explained in *Smith*, treaty jurisdiction and domestic jurisdiction are often linked. *See* 452 F.2d at 802. Jurisdictional statutes such as 28 U.S.C. § 1331 (federal question jurisdiction) and 22 U.S.C. § 9003(a) (ICARA jurisdiction) authorize district courts to hear cases that "aris[e] under" a treaty, and a case will arise under that treaty only when the case meets the treaty's jurisdictional requirements.

The Hague Convention specifies its treaty jurisdiction in Articles 8 and 30, which together "delimit which nation-states' courts can hear a claim arising under the treaty." *Nat'l Union Fire Ins. Co.*, 74 F.4th at 74 (analyzing an analogous provision of the Montreal Convention). According to Article 8, a person (or other entity) "claiming that a child has been removed or retained . . . may apply either to *the Central Authority of the child's habitual residence* or to the *Central Authority of any other Contracting State* for assistance in securing the return of the child." Convention, Art. 8 (emphasis added).[8] The claimant may submit this application either to the Central Authorities themselves or "directly to the judicial or administrative authorities of a Contracting State." *Id.* at Art. 30. Tying these provisions together, a court has treaty jurisdiction over a Hague Convention petition when (1) the child is "habitual[ly] residen[t]" in a Contracting State with a "Central Authority," *id.* at Art. 8, and (2) the court is a "judicial . . . authorit[y]" of a Contracting State, *id.* at Art 30.

As for domestic jurisdiction, a district court's jurisdiction is limited by Article III and any other applicable statutory requirements. The relevant statute here is ICARA, which provides in its jurisdictional provision that "[t]he courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention." 22 U.S.C. § 9003(a) (entitled "Jurisdiction of courts"). This appears to be ICARA's only jurisdictional limit, as no other provisions "speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 (2006) (internal quotation marks omitted) (explaining

---

[8] Article 6 of the Convention requires each Contracting State to "designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities." Convention, Art. 6.

that a statutory element is presumptively non-jurisdictional if it does not appear in a statute's jurisdictional provision).[9]

Karimi argues here that the District Court lacked subject-matter jurisdiction because Tereschenko consented to the children's removal from Ukraine. As should be apparent, that argument has a false premise: consent (or lack of it) is not a jurisdictional requirement to a petition brought under the Convention. Neither the Convention's jurisdictional provisions nor our own domestic jurisdictional law requires that the removal be wrongful or without consent. The treaty requires only that the children be habitually resident in a Contracting State (as the children are here) and that the court hearing the petition be one in a Contracting State (as the district court is here). As for domestic law, ICARA explicitly authorizes the district court to hear the petition, and nothing suggests the presence of other constitutional or statutory jurisdictional defects. *See, e.g.*, *Hofmann v. Sender*, 716 F.3d 282, 290 (2d Cir. 2013) (explaining that, in circumstances not present here, a Convention petition could become moot). While consent and wrongful removal bear on the *merits* of a petition under the Convention, those issues have nothing to do with jurisdiction, whether treaty or domestic. *See id.* at 291, 294–95 (quoting *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005)) (discussing the elements of a prima facie case of wrongful retention and affirmative defenses thereto).

Accordingly, the District Court had subject matter jurisdiction over Tereshchenko's petition.

---

[9] Although 22 U.S.C. § 9003(b) also mentions "jurisdiction," that provision goes to *venue*, as it "deals with the question of which court, or courts, of those which possess adequate . . . jurisdiction, may hear the specific matter in question." *United States ex rel. Rudick v. Laird*, 412 F.2d 16, 20 (2d Cir. 1969).

## IV.    Prima Facie Case of Wrongful Retention and Consent

Karimi's arguments as to why the District Court lacked jurisdiction over
Tereshchenko's petition—that the children were not "wrongfully retained" in the
United States because Tereshchenko consented to their removal from Ukraine, *see*
Appellant's Br. at 18–22—go not to a court's subject matter jurisdiction, but to the merits
of Tereshchenko's petition. Considering these arguments on the merits,[10] they fail.

A parent seeking the return of a child under the Convention must prove by a
preponderance that: "(1) the child was habitually resident in one State and has been
removed to or retained in a different State; (2) the removal or retention was in breach of
the petitioner's custody rights under the law of the State of habitual residence; and (3)
the petitioner was exercising those rights at the time of the removal or retention." *Gitter*,
396 F.3d at 130–31. Even where a petitioner has established this prima facie case,
however, the Convention provides that the court "is not bound" to order the return of
the child if the respondent establishes that "the person . . . having the care of the person
of the child . . . had consented to or subsequently acquiesced in the removal or
retention." Convention, Art. 13(a).

Here, the mere fact that Tereshchenko consented to the children's *removal* from
Ukraine in the emergency of the Russian invasion does not mean that he failed to prove
his prima facie case of wrongful *retention*. Nor does it mean that Karimi has established
a "consent" or "acquiescence" defense under Article 13(a). As Tereshchenko asserted
and the District Court found, Tereshchenko never consented to Karimi's "taking the

---

[10] Indeed, at oral argument, Karimi's counsel appeared to argue that these arguments were also
challenges on the merits, contending that "[w]hether you frame it" as a question of "subject
matter jurisdiction" or not, "the issue is whether . . . a prima facie case even exists to raise a
Hague Convention claim." Oral Arg. Tr. at 4. We accordingly address and dismiss them on that
basis as well.

children to undisclosed locations, including the United States, or interfering with his access to them." *Tereshchenko*, 2024 WL 80427, at *8. Rather, Tereshchenko's initial agreement to surrender the children's travel documents permitted Karimi to get the children to safety; she was not acting with his consent when she moved them, without Tereshchenko's knowledge, to the United States and retained them there. *See id.* When Karimi did so, that act was wrongful within the meaning of Article 3 because it breached Tereshchenko's custody rights under the Ukrainian Family Code. *See id*. at *4.

On these grounds, we agree with the District Court both that Tereshchenko proved his prima facie case of wrongful retention under Article 3 and that Karimi's Article 13(a) consent defense fails.

## V.     Karimi's Remaining Affirmative Defenses

Next, we address Karimi's arguments that the District Court abused its discretion by refusing to consider aspects of the children's settlement in the United States and in concluding that to return the children to western Ukraine would not expose them to a grave risk of harm.

### A.     The District Court did not abuse its discretion in excluding evidence related to the "now settled" defense.

In Article 12, the Convention directs that, when a court receives a petition for return within one year after the child's wrongful removal, it "*shall order* the return of the child forthwith." Convention, Art. 12 (emphasis added). Article 12 frames a court's obligations differently when a petition is filed after a year has passed:

> [W]here the proceedings have been commenced after the expiration of the period of one year [from the date of the wrongful removal or retention], [the court] shall also order the return of the child, *unless it is demonstrated that the child is now settled in its new environment*.

*Id.* (emphasis added). The so-called "now settled" defense is thus available only in proceedings "commenced after the expiration of [a] period of one year" from the wrongful removal or retention. *Id.* To trigger these slightly more discretionary standards allowed under Article 12, a respondent must establish that the children are "now settled" elsewhere by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

Karimi did not raise a "now settled" defense in her Answer. Nevertheless, on December 21, 2023, less than two weeks before the January 3, 2024 hearing, and roughly nine months after she was served, Karimi submitted for the court's consideration proposed evidence and witness statements that hinted she might seek to raise the Article 12 defense and take the position that, having been there since July 12, the children were "now settled" in New York City. *Tereshchenko*, 2024 WL 80427, at *6.

Tereshchenko soon filed a motion in limine, seeking a court order excluding Karimi's exhibits that were related to the asserted settlement of the children in the United States. The District Court granted the motion. It explained that "[Tereshchenko] was prejudiced by [Karimi's] failure to identify this as a defense until the eve of the hearing," and noted that "[Tereshchenko's] motion in limine was not triggered by any explicit invocation of this defense, but by the inference the petitioner drew from the respondent's hearing exhibits." *Id.* at *6–7.

Federal Rule of Civil Procedure 8(c)(1) requires a party to "affirmatively state any . . . affirmative defense" in responding to a pleading. Fed. R. Civ. P. 8(c)(1). Accordingly, "[o]rdinarily, defendants are deemed to have . . . forfeited defenses that they did not raise at the outset of the litigation." *Carroll v. Trump*, 88 F.4th 418, 422 (2d Cir. 2023); *see also* 5 C. Wright & Miller, Federal Practice and Procedure § 1278 (4th ed. 2023) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by [Rule]

8(c) results in the waiver of that defense and its exclusion from the case.") (collecting cases).

Resisting application of this rule, Karimi contends that her Answer (filed on June 21, 2023) was prepared under "extreme time pressure." Appellant's Br. at 23. Karimi had counsel (and repeatedly changed counsel) throughout the six months of proceedings that preceded the January 2024 hearing, and yet she never sought to amend her Answer to assert the "now settled" defense. And the District Court's schedule was fully in keeping with the Convention, which requires that trial courts render a "determination as to whether to order return should be made using the most expeditious procedures available." *Golan v. Saada*, 596 U.S. 666, 671 (2022) (internal quotation marks omitted and alterations adopted).

Karimi further argues that the pleading omission should be excused because Tereshchenko in the end had notice of the defense and opportunity to respond. Appellant's Br. at 24–25 (citing *EMA Fin., LLC v. Chancis*, 80 F.4th 395, 404 (2d Cir. 2023)). As the District Court found, however, Tereshchenko had no reason to expect this fact-heavy defense until December 21, 2023, when Karimi submitted extensive proposed evidence and witness statements. This was during the holidays and a mere 13 days before the scheduled hearing.

Accordingly, we have no difficulty concluding that the District Court did not rule "in an arbitrary and irrational fashion" when it granted the motion in limine and concluded that Tereshchenko would have been prejudiced had he been required to

respond to Karimi's "now-settled" defense on the pre-set timeline—a timeline that had

already been unnecessarily protracted. [11] *See Torcivia*, 17 F.4th at 365.[12]

    B.    <u>The children would face a grave risk of harm were they returned now to</u>
         <u>western Ukraine.</u>

       Karimi next contends that the District Court erred in deciding that returning the

children to Ukraine—including to western Ukraine—would not expose the children to

"a grave risk" of "physical or psychological harm or otherwise place the child in an

---

[11] The parties debate whether a year, correctly calculated, had passed before Tereshchenko filed his petition and thus whether Karimi was entitled under Article 12 to assert the "now settled" defense. In light of our conclusion that Karimi forfeited the defense, we need not resolve that question.

[12] We also reject Karimi's somewhat perfunctory argument that the District Court's "curtailed process"—including requiring her to file any pleadings motion and an Answer on the same day and restricting the January 3 hearing to 90 minutes total for each side to present their case—deprived Karimi of a meaningful opportunity to be heard. Appellant's Br. at 39–41. Article 11 of the Convention mandates that "[t]he judicial . . . authorities of Contracting States shall act expeditiously in proceedings for the return of children." Convention, Art. 11. In addition, Article 18 advises that the Convention's provisions "do not limit the power of a judicial . . . authority to order the return of the child *at any time.*" *Id.* at Art. 18 (emphasis added). These provisions establish that, as at least one sister circuit has observed, "a district court has a substantial degree of discretion in determining the procedures necessary to resolve a petition filed pursuant to the Convention and ICARA." *West v. Dobrev*, 735 F.3d 921, 929 (10th Cir. 2013). Its authority includes the discretion to determine whether to use summary adjudication or other expedited procedures. *See id.; see also March v. Levine*, 249 F.3d 462, 468, 474 (6th Cir. 2001) (explaining that "neither [the Convention nor ICARA] expressly requires a hearing or discovery"; instead, they require "expeditious action"). Karimi's failure to receive a more-extensive hearing was not a violation of due process.

Relatedly, we reject Karimi's contention that the District Court's exclusion of her rebuttal evidence was unreasonable and constituted an abuse of discretion. Appellant's Br. at 41–42. The District Court credited Tereshchenko's counsel's representation that he "never received any rebuttal submissions" from Karimi's counsel. J. App'x at 284; *see also id.* at 279–82. It also found that Karimi's counsel had failed to properly deliver physical copies of the rebuttal evidence to the court. *See* J. App'x at 281. In these circumstances, we cannot say that the court's exclusion of the rebuttal evidence was outside "the range of permissible decisions." *Zervos*, 252 F.3d at 169.

intolerable situation." Convention, Art. 13(b). An Article 13(b) defense must be proved by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

We have observed that a "grave risk of harm" defense that meets the Article 13(b) standard may arise "where returning the child means sending him to a zone of war, famine, or disease." *Souratgar*, 720 F.3d at 103 (internal quotation marks omitted). At the same time, as at least one sister circuit has also recognized, there is a "lack of precedent identifying any country as a zone of war sufficient to trigger the grave risk or intolerable situation exception." *Salame v. Tescari,* 29 F.4th 763, 769 (6th Cir. 2022). Indeed, the parties point us to no decision by a United States court considering whether a grave risk would be posed by returning a child to a country that is in the midst of an invasion and subject to repeated missile attacks.

In briefly discussing and concluding that no grave risk of harm to them would result were the children returned to "a location in western Ukraine that is outside the zone of combat and danger," *Tereshchenko*, 2024 WL 80427, at *6, the District Court relied heavily on the decision by a United Kingdom court in *Q v. R*, [2022] EWHC (Fam) 2961 [55]–[56], another Convention case, which rejected the grave risk defense. After closely reviewing the then-prevailing conditions in various areas within Ukraine, that court ordered the return of a child to a "Town B" in Transcarpathia—an oblast in western Ukraine. *See id.* at [24], [65].

We hesitate to rely now on that decision. It was issued on September 21, 2022, approximately 19 months ago, and strikes us as not especially probative of general conditions in western Ukraine at the time of the District Court's ruling in January 2024. It seems similarly not informative about the specifics of life now in the western Ukrainian city of L'viv, where Tereshchenko agreed that he "theoretically" could take the children (while plainly preferring not to). J. App'x at 286. Indeed, the United Kingdom court's 2022 decision explicitly acknowledged that L'viv had been "subject to

24

missile attacks on civilian or military facilities," and stressed that the "Town B" was "more than 100 miles away." *Q v. R*, EWHC 2961, at [51].

In contrast, and perhaps because of the great need for an expedited ruling, the District Court here did not inquire into the details of conditions in a specific city and residence in Ukraine to which the children could be brought. *See id.* at [57]–[58] (British court crediting mother's evidence that, in Town B, schools and businesses remained open and the risk of armed conflict was low). The District Court may have viewed a town-by-town analysis of war-torn Ukraine as superfluous because it accepted that Ukrainian law permitted Tereshchenko to remove the children from western Ukraine to France as quickly as possible, just touching down first in Ukraine, and thus reasonably wrote that it would "elevate form over substance" to require him to do so.[13] *Tereshchenko*, 2024 WL 80427, at *10. The result, however, is that the record contains little evidence on the conditions that the children would face if returned to Tereshchenko in L'viv.

Still, based on what record evidence does exist—and mindful of the rapidly evolving nature of the military conflict taking place—we decline to adopt the District Court's stated determination that the children faced no "grave risk of harm" if returned to Ukraine with Tereshchenko. Tereshchenko agreed at the January 3, 2024 hearing that although he would be "willing" to comply with a court order returning the children to western Ukraine, "everywhere," was "dangerous," including L'viv. J. App'x at 286.

---

[13] The District Court observed that a Ukrainian Executive Order issued on March 21, 2022, in response to the war with Russia, grants relatives a "unilateral[]" right to remove a child from Ukraine. *Tereshchenko*, 2024 WL 80427, at *10 (citing *Note regarding the crossing of state borders by children*, Terre des Hommes, https://childhub.org/en/child-protection-online-library/note-regarding-crossing-state-borders-children-persons-disabilities-and-persons-accompanying-them-state-emergency-or-martial-law?language=ro [https://perma.cc/27JN-N4MA] (last visited April 16, 2024)).

Record evidence supports Tereshchenko's fears. A news report documents July 2023 missile strikes in L'viv that killed 10 civilians and injured another 48. *See id.* at 682–87. Also, because one of the children, K.T., is a U.S. citizen, we must give special weight to the Department of State's current advisory that U.S. citizens should simply "not travel to Ukraine due to active armed conflict." J. App'x at 468, 731. [14] In light of this evidence, we disagree with the District Court that Tereshchenko's mere representation that he would be willing to receive the children in Ukraine and then move with the children to "a location in western Ukraine that is outside the zone of combat and danger" was "sufficient to defeat [Karimi's] Article 13(b) [grave-risk] defense." *Tereshchenko*, 2024 WL 80427, at *6.

Both parents agreed to remove the children from Ukraine because of their shared perception of dangers posed by the Russian invasion. And both parents continue to recognize the dangers posed by returning the children to Ukraine. Appellant's Br. at 30–32, J. App'x at 286. In the face of Tereshchenko's testimony that life in western Ukraine was dangerous and evidence establishing that Russia is bombing western Ukrainian cities, the District Court clearly erred in concluding that returning the children to L'viv would not expose them to a grave risk of harm.

Nevertheless, this error does not require reversal, as we explain below.

## VI.    Third-Country Return

Notwithstanding our determination concerning the grave risk of harm facing the children in Ukraine, we reach the same conclusion as did the District Court and affirm its grant of Tereshchenko's petition. We do so because the Convention permits—as a

---

[14] *See* U.S. Department of State, Ukraine Travel Advisory (published May 22, 2023), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/ukraine-travel-advisory.html [https://perma.cc/5NCD-PP7Y] (last visited April 16, 2024).

temporary ameliorative measure—a court in certain rare circumstances to return a child
to a petitioner who is not himself in the place of habitual residence, but temporarily in a
third country. The ongoing war in Ukraine simply precludes entry of the ordinary
Hague Convention order.

Even so, the District Court's order returning the children to Tereshchenko in
France must be tailored to secure the continued authority of the Ukrainian courts over
the children and over the parents' respective custody rights. Absent such tailoring, the
order has the effect of an impermissible custody determination. Accordingly, we
remand to allow expeditious amendment of the order in line with these fundamental
goals.

A.    <u>The Convention permits district courts to impose discretionary
      ameliorative measures to mitigate harms posed by return to the place of
      habitual residence.</u>

"[T]he Convention generally requires the 'prompt return' of a child to the child's
country of habitual residence when the child has been wrongfully removed to or
retained in another country." *Golan*, 596 U.S. at 670 (quoting Convention, Art. 1(a)). But
when a court determines that the child faces a grave risk of harm, "Article 13(b) lifts the
Convention's return requirement, leaving a court with the *discretion* to grant or deny
return." *Id.* at 676 (emphasis added). In exercising that discretion, the district court may
consider whether to impose "ameliorative measures"—conditions that parents or state
authorities shall follow—to help mitigate the risks that the child would face upon her
return. *Id.* at 669 (internal quotation marks omitted). For instance, if an "epidemic
rages" in a part of the child's home country, the district court could, in its discretion,
choose to order return "to another part of the country" that is unaffected. *Id.* at 677; *see
also Blondin v. Dubois*, 189 F.3d 240, 248–49 (2d Cir. 1999) (discussing proposed

"ameliorative measure" of placing children in temporary care of their godmother, pending a final adjudication of custody by the courts of France).

Significantly, the Supreme Court has identified two limits on this discretionary power. First: any ameliorative measures "must prioritize the child's physical and psychological safety." *Golan*, 596 U.S. at 680. Given the paramount importance of the child's welfare under the Convention, district courts must fashion ameliorative measures with an eye toward keeping children safe from harm. Second: a court must remain vigilant not to decide either by intention or effect the "merits of the underlying custody claim" when adjudicating a petition under the Convention. *Blondin*, 189 F.3d at 245 (internal quotation marks omitted); *see also Golan*, 596 U.S. at 671 ("Consistent with the Convention, ICARA empowers courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." (internal quotation marks omitted and alterations adopted)); Convention, Art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). Thus, a court must treat the return order that it crafts as a "provisional remedy that fixes the *forum* for custody proceedings"; it must avoid inadvertently fixing custody itself. *Golan*, 596 U.S. at 671 (emphasis added) (internal quotation marks omitted). In turn, a district court must limit any "ameliorative measures" that it enters "in time and scope to conditions that would permit safe return, without purporting to decide subsequent custody matters or weighing in on permanent arrangements." *Id.* at 681. Return orders that put in place unconditional or unqualified ameliorative measures "delve into the merits of the underlying custody claims" and are not allowed by the Convention. *Hollis v. O'Driscoll*, 739 F.3d 108, 112 (2d Cir. 2014).

B.    The Convention permits, as an ameliorative measure, a district court to
order the temporary return of a child to a petitioner in a country other
than the place of habitual residence.

In certain cases, a district court may impose an ameliorative measure that orders
the temporary return of a child to a country that is not her place of habitual residence.
Although Karimi argues that such third-country returns are *never* permissible, we are
not persuaded that they are categorically barred by the Convention, especially when the
third-country return is a temporary ameliorative measure designed to protect the child
from a grave risk of harm.

At the outset, we acknowledge that one of the Convention's principal purposes is
to return a child to her country of habitual residence, where any custody dispute can be
resolved under that country's laws. Thus, the Convention's Preamble provides in part:

> The States signatory to the present Convention . . . [d]esiring to protect
> children internationally from the harmful effects of their wrongful removal
> or retention and to establish procedures to ensure their prompt return to
> the State of their habitual residence . . . have agreed upon the following
> provisions.

Convention, Preamble. The typical remedy under ICARA is thus an order directing the
"prompt return" of a child to the child's "country of habitual residence." *Golan*, 596 U.S.
at 670. The success of a petition may turn on correctly identifying that country, and
disputes may focus on that process. *See, e.g.*, *Gitter*, 396 F.3d at 131–32; *Mauvais v.
Herisse*, 772 F.3d 6, 11–14 (1st Cir. 2014).

Despite that opening hortatory language, the Convention's text does not, at least
in express terms, require that the child be returned to the place of habitual residence in
all cases. Indeed, the Convention's text uses the full phrase "return to the State of [the
child's] habitual residence" only in the Preamble; the rest of the Convention uses the
unqualified phrase "return of the child." *See, e.g.*, Convention, Arts. 7, 8, 10, 12, 13. The
Convention's text thus leaves room to consider whether—although it presumes return

to the country of habitual residence—it should be understood to *preclude* an order requiring the child's return to a petitioner who is no longer in the country of habitual residence. *See In Re B* (A Child), [2020] EWCA (Civ) 1187 [110] ("[T]o confine the terms of Article 12 to permitting a return only to the state of habitual residence . . . would not promote the objectives of the 1980 Convention."); *see also O v. O (Child Abduction: Return to Third Country)* [2014] EWHC (Fam) [87] (before abduction to England, parents agreed to relocate from Australia, the country of habitual residence, back to the United States, where family previously resided; court ordered child returned to United States).

We think that the Convention's text cannot be read to bar categorically the return of a child to a petitioner in a country other than the place of habitual residence. A commentary document now called the Pérez-Vera Report was prepared contemporaneously with the Convention's formulation. *See* 1980 Conférence de La Haye de droit international privé, Enlèvement d'enfants, E. Pérez-Vera, Explanatory Report, in 3 Actes et documents de la Quatorzième session (1982). Akin to a legislative history of the Convention, it has served as "an authoritative source for interpreting the Convention's provisions." *Gitter*, 396 F.3d at 129 n.4 (internal quotation marks omitted). It advises that the Convention's use of the unqualified "return of the child" language (as opposed to "return of the child to the State of habitual residence") was deliberate:

> *The Convention did not accept a proposal to the effect that the return of the child should always be to the State of its habitual residence before removal.* . . . [W]e must not forget that it is the right of children not to be removed from a particular environment which sometimes is a basically family one, which the fight against international child abductions seeks to protect. Now, when the applicant no longer lives in what was the State of the child's habitual residence prior to its removal, the return of the child to that State might cause practical problems which would be difficult to resolve. *The Convention's silence on this matter must therefore be understood as allowing the authorities of the State of refuge to return the child directly to the applicant, regardless of the latter's present place of residence.*

Pérez-Vera Report ¶ 110 (emphasis added).

Similarly, in a notice issued as Congress adopted the Convention, the U.S. Department of State recognized that Article 12 of the Convention "does not technically require that the child be returned to his or her State of habitual residence." Public Notice 957, 51 Fed. Reg. at 10511 (1986). While cautioning that "in the classic abduction case" return to the country of habitual residence "will occur," it explained that "[i]f the petitioner has moved from the child's State of habitual residence the child will be returned to the petitioner, not the State of habitual residence." *Id.*

The Supreme Court has instructed that both these extra-textual sources deserve consideration. *See Golan*, 596 U.S. at 680 n.8 ("This Court has repeatedly referenced the report in Hague Convention cases, without deciding whether this Report should be given greater weight than a scholarly commentary." (internal quotation marks omitted and alterations adopted)); *Abbott*, 560 U.S. at 15 ("[T]he Executive Branch's interpretation of a treaty is entitled to great weight." (internal quotation marks omitted)). In conjunction with the Convention's text, these sources suggest to us that in some exceptional cases it is appropriate, and lawful under the Convention, for courts to deviate from the typical remedy and to return a child to a petitioner who is at the time of the order located in a third country. *Cf. Chen v. Major League Baseball Props., Inc.*, 798 F.3d 72, 76 (2d Cir. 2015) ("[W]here a statute is ambiguous, we may look to legislative history to discern the legislature's intent.").

We see no reason why the Convention would categorically bar district courts from, as an ameliorative measure, ordering a child to temporarily reside in a third country to mitigate a grave risk of harm in the state of habitual residence. As the Supreme Court has made clear, district courts have wide latitude to fashion a remedy in such circumstances; this includes the power to keep the child here or to send her home, optionally with additional measures to mitigate any risk of harm. *See Golan*, 596 U.S. at

678–79. Of course, that discretion is limited to a certain extent, in that district courts may not impose permanent or unqualified ameliorative measures that amount to a custody determination or that interfere with custody proceedings in the courts in the place of habitual residence. *See id.* at 680–81. But so long as those limits are respected, nothing in the Convention appears to bar a district court, in exercising its ameliorative discretion, from sending the child temporarily to a third country to avoid the risk of harm in the state of habitual residence.

     C.     <u>The District Court correctly ordered the children's return to</u>
               <u>Tereshchenko but impermissibly effected a custody determination.</u>

     The District Court's order sending the children to reside with their father in France is an ameliorative measure that properly considers "the interests of [the] children." *Golan*, 596 U.S. at 679 (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 19 (2014) (Alito, *J.*, concurring)). It avoids the grave risk of harm that the children would face if returned to western Ukraine. As mentioned above, the order seems to us particularly appropriate in this case, where one of the children is a U.S. citizen and subject to the Department of State's advisory against travel to Ukraine.

     Furthermore, the order promotes several other relevant interests under the Convention. These include: "the child's need for contact with the non-abducting parent"; "the non-abducting parent's interest in exercising the custody to which he or she is legally entitled"; "the need to discourage inequitable conduct"; and "the need to deter international abductions generally." *Lozano*, 572 U.S. at 19 (Alito, *J.*, concurring). The District Court here was thus justified in deviating from the Convention's typical

remedy of return to the country of habitual residence in favor of ordering return elsewhere in the care of the petitioning parent.[15]

The court's order was too open-ended, however, and in effect granted Tereshchenko permanent custody over the children in France. *See Tereshchenko*, 2024 WL 80427, at *10 (ordering the children returned to Tereshchenko to have the children physically "reside in his home in France"). This is a right that he did not previously enjoy. The Ukrainian executive order issued on March 21, 2022, in response to the war with Russia, *see supra* n. 10, grants relatives generally the equal right to unilaterally remove children from the country. But it does not purport to give Tereshchenko as an individual custody rights over the children in Ukraine or anywhere else. And although Tereshchenko has prevailed thus far before the Guardianship Body and the Ukrainian Court in his search for a custody ruling favorable to him, those decisions are stayed as a matter of Ukrainian law pending appeal. *See Tereshchenko*, 2024 WL 80427, at *4. In any event, neither decision awarded Tereshchenko a right to have the children reside with him in *France*. Indeed, the Ukrainian Court decision grants Tereshchenko custody of the children at a particular address in Ukraine. *See* J. App'x at 1190 (fixing the children's place of residence at a specific address in Odesa).

In this regard, the District Court's order imposes no limitation as to the "time and scope" of the children's residence in France, *Golan*, 596 U.S. at 681, or on other aspects of his rights to have them reside with him. Most crucially, it contains no conditions designed to preserve the authority of the Ukrainian Courts while the children stay with Tereshchenko in France, safe from the war in Ukraine. Accordingly,

---

[15] We do not here decide whether and if so, when, it would be permissible to return a child to a petitioner in a third country absent a finding that the child would be exposed to a grave risk of harm under Article 13(b) if returned to the country of habitual residence.

we think the order needs further shaping to avoid having the practical effect of granting Tereshchenko physical custody over the children in France. Such additional terms can be shaped and imposed expeditiously, we believe, and without further fact-finding.

On remand, the District Court should fashion a limited and temporary order that directs the children to stay with Tereshchenko in France, commits Tereshchenko to making the children available for the Ukrainian custody proceedings as required by those courts, and directs the parties to abide by the final custody determination of those courts. Such tailoring would help ensure that the order serves the goals of the Convention and would align more closely with the Convention's general principle that "the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott*, 560 U.S. at 20. The order should not unconditionally expand Tereshchenko's custody rights.

Accordingly, we remand the case to allow the District Court to amend its current order by adding such directives, taking into account any relevant developments since the January 3 hearing.

## CONCLUSION

For the reasons set forth above, we **AFFIRM IN PART** and **REMAND** the case for proceedings consistent with this opinion. We also **VACATE** the stay of the District Court's order that we entered pending resolution of this appeal.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit